11-1858-cv
Adelphia Recovery Trust v. Goldman, Sachs & Co., et al.

1            UNITED STATES COURT OF APPEALS

2               FOR THE SECOND CIRCUIT

3                 August Term, 2011

4

5      (Argued: April 25, 2012      Decided: April 4, 2014)

6               Docket No.  11-1858-cv

7      - - - - - - - - - - - - - - - - - - - - - - - - - - -

8   ADELPHIA RECOVERY TRUST, AKA THE ADELPHIA CONTINGENT VALUE
9   VEHICLE,
10            Plaintiff-Counter-Defendant-Appellant,
11
12  ADELPHIA COMMUNICATIONS CORP., AND ITS AFFILIATED DEBTORS AND
13  DEBTORS IN POSSESSION, OFFICIAL COMMITTEE OF EQUITY SECURITY
14  HOLDERS OF ADELPHIA COMMUNICATIONS CORP., OFFICIAL COMMITTEE OF
15  UNSECURED CREDITORS OF ADELPHIA COMMUNICATIONS CORP.,
16            Plaintiffs-Counter-Defendants,
17
18                v.
19
20  GOLDMAN, SACHS & CO.,
21            Defendant-Appellee,
22
23  HARRIS NESBITT CORP., DEUTSCHE BANK AG, BANK OF NEW YORK COMPANY,
24  INC., DAI-ICHI KANGYO BANK, LTD., THE INDUSTRIAL BANK OF JAPAN,
25  LIMITED, IBJ WHITEHALL FUNDING 2001 TRUST, MIZUHO CORPORATE BANK,
26  LTD., J.P. MORGAN SECURITIES, INC., MOUNTAIN CAPITAL CLO I,
27  MOUNTAIN CAPITAL CLO II, UBS AG, MELLON BANK, N.A., J.P. MORGAN
28  SECURITIES, INC., DEUTSCHE BANK AG, J.P. MORGAN CHASE BANK, N.A.,
29  NATIONWIDE LIFE INSURANCE COMPANY, NATIONWIDE LIFE AND ANNUITY
30  INSURANCE COMPANY, NATIONWIDE MUTUAL INSURANCE COMPANY, MARATHON
31  SPECIAL OPPORTUNITY MASTER FUND, LTD., SPRUGOS INVESTMENTS IV,
32  L.L.C., BNP PARIBAS, FIRST HAWAIIAN BANK, NON-AGENT LENDERS,
33  PUTNAM DIVERSIFIED INCOME TRUST, PUTNAM HIGH YIELD ADVANTAGE
34  FUND, PUTNAM HIGH YIELD TRUST, PUTNAM MASTER INCOME TRUST, PUTNAM
35  MASTER INTERMEDIATE INCOME TRUST, PUTNAM PREMIER INCOME TRUST,
36  PUTNAM VARIABLE TRUST—PVT DIVERSIFIED INCOME FUND, PUTNAM
37  VARIABLE TRUST—PVT HIGH YIELD FUND, PUTNAM FLOATING RATE INCOME
38  FUND, PUTNAM FUNDS TRUST-PUTNAM HIGH YIELD TRUST II, PUTNAM HIGH
39  YIELD FIXED INCOME FUND, PUTNAM HIGH YIELD MANAGED TRUST, PUTNAM

```
 1   MANAGED HIGH YIELD TRUST, PUTNAM STRATEGIC INCOME FUND, TRAVELERS
 2   SERIES FUND, INC.-PUTNAM, KZH HOLDING CORPORATION III, KZH
 3   CYPRESS TREE-1 LLC, KZH III LLC, KZH ING-2 LLC, KZH LANGDALE
 4   LLC, KZH PONDVIEW LLC, KZH SHOSHONE LLC, KZH WATERSIDE LLC, KZH
 5   CNC LLC, KZH HIGHLAND-2 LLC, KZH ING-1 LLC, KZH ING-3 LLC, KZH
 6   PAMCO LLC, KZH SOLEIL-2 LLC, KZH STERLING LLC, KZH RIVERSIDE LLC,
 7   KZH SOLEIL LLC, MERRILL LYNCH PIERCE, FENNER & SMITH
 8   INCORPORATED, MERRILL LYNCH CREDIT PRODUCTS LLC, MIZUHO GLOBAL
 9   LIMITED, APEXTRIMARAN-CDO I, LTD., CARAVELLE INVESTMENT FUND,
10   L.L.C., CARAVELLE INVESTMENT FUND II, L.L.C., GOLDMAN SACHS
11   CREDIT PARTNERS, L.P., SEI INSTITUTIONAL INVESTMENTS TRUST AND
12   THE SEI INSTITUTIONAL MANAGED TRUST, FIFTH THIRD BANK, FLEET
13   NATIONAL BANK, BANK OF TOKYOMITSUBISHI TRUST COMPANY, N/K/A BANK
14   OF TOKYO-MITSUBISHI UFJ TRUST COMPANY, MITSUBISHI UFJ TRUST AND
15   BANKING CORPORATION, HALCYON FUND, L.P., EXIS HOLDING LTD., RBS
16   CITIZENS, N.A., KZH ENTITIES, DEUTSCHE BANK AG NEW YORK BRANCH,
17   HCM/Z SPECIAL OPPORTUNITIES LLC, PHOENIX-GOODWIN HIGH YIELD FUND,
18   BNY MELLON CAPITAL MARKETS, LLC, CITIGROUP GLOBAL MARKETS INC.,
19   BANK OF TOKYOMITSUBISHI TRUST COMPANY, MITSUBISHI TRUST AND
20   BANKING CORPORATION, CIBC WORLD MARKETS INC., CREDIT SUISSE, NEW
21   YORK BRANCH, SUNTRUST ROBINSON HUMPHREY, INC., CREDIT SUISSE
22   CAPITAL FUNDING, INC., THE BANK OF NEW YORK MELLON, SOCIETE
23   GENERALE, COWEN AND COMPANY, LLC, BMO CAPITAL MARKETS CORP., SUN
24   TRUST BANK, BANK OF AMERICA SECURITIES LLC,
25                Defendants,
26
27   THE FUJI BANK, LIMITED, THE TORONTO-DOMINION BANK,
28                Defendants-Consolidated-Defendants,
29
30   TORONTO DOMINION (TEXAS) LLC, THE BANK OF NOVA SCOTIA, CREDIT
31   SUISSE (USA), INC., TD SECURITIES (USA) LLC,
32                Defendants-Consolidated-Defendants-Counter-Claimants,
33
34   BANK OF AMERICA, N.A., INDOSUEZ CAPITAL FUNDING IIA, LTD., LCM I
35   LIMITED PARTNERSHIP, CALYON NEW YORK BRANCH, CALYON SECURITIES
36   (USA), INC., LIMITED AND INDOSUEZ CAPITAL FUNDING VI, LTD., BANK
37   OF NEW YORK CAPITAL MARKETS, INC., HSBC BANK USA, NATIONAL
38   ASSOCIATION, BANK OF MONTREAL, CITIBANK, N.A. AND CITICORP USA,
39   INC., BARCLAYS BANK PLC, PNC BANK, N.A., DEUTSCHE BANK TRUST
40   COMPANY AMERICAS, SOCIETE GENERALE, S.A., MERRILL LYNCH & CO.,
41   INC., MERRILL LYNCH CAPITAL CORP., BANK OF NEW YORK, ABN AMRO
42   BANK, N.V., COOPERATIVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.,
43   "RABOBANK NEDERLAND" NEW YORK BRANCH, MORGAN STANLEY SENIOR
44   FUNDING, INC.,
45                Defendants-Counter-Claimants,
46
47   WACHOVIA BANK, NATIONAL ASSOCIATION,
48                Defendant-Bankruptcy-Movant-Counter-Claimant,
49
```

```
 1  WACHOVIA CAPITAL MARKETS LLC, CITIGROUP GLOBAL MARKETS HOLDINGS,
 2  INC., COWEN & CO., LLC, SCOTIA CAPITAL (USA), INC.,
 3           Consolidated-Defendants-Counter-Claimants,
 4
 5  CITIGROUP FINANCIAL PRODUCTS, INC.,
 6           Consolidated-Defendant,
 7
 8  ABN AMRO INC., DEUTSCHE BANK SECURITIES, INC., FLEET SECURITIES,
 9  INC., CIBC WORLD MARKETS CORP., MORGAN STANLEY & CO.
10  INCORPORATED, BARCLAYS CAPITAL INC., SUNTRUST CAPITAL MARKETS,
11  INC., BANC OF AMERICA SECURITIES LLC., PNC CAPITAL MARKETS LLC,
12  CIBC INC., BMO CAPITAL MARKETS FINANCING, INC., SUNTRUST BANK,
13  THE ROYAL BANK OF SCOTLAND PLC,
14           Counter-Claimants.
15
16  - - - - - - - - - - - - - - - - -- - - - - - - - - - - -
17
18  B e f o r e:   WINTER, WALKER, and CABRANES, Circuit Judges.
19
20       Appeal from a judgment of the United States District Court
21  for the Southern District of New York (Lawrence M. McKenna,
22  Judge) granting summary judgment to defendant-appellee Goldman,
23  Sachs & Co. and dismissing Adelphia Recovery Trust's fraudulent
24  conveyance claim brought pursuant to 11 U.S.C. § 548(a)(1)(A).
25  We affirm on grounds of judicial estoppel.
26                          DAVID M. FRIEDMAN (Michael C. Harwood &
27                          Howard W. Schub, on the brief),
28                          Kasowitz, Benson, Torres & Friedman,
29                          LLP, New York, NY, for Plaintiff-
30                          Counter-Defendant-Appellant.
31
32                          MELVIN A. BROSTERMAN (Claude G. Szyfer
33                          and Francis C. Healy, on the brief),
34                          Stroock & Stroock & Lavan LLP, New York,
35                          NY, for Defendant-Appellee.
36
37  WINTER, Circuit Judge:
38
39       The Adelphia Recovery Trust, an entity created to represent
40  the non-whole creditors of a debtor corporation that is party to
41  a bankruptcy proceeding described below, appeals from Judge
42  McKenna's grant of summary judgment dismissing its fraudulent
43  conveyance claim against Goldman, Sachs & Co.  In such a
```

1    fraudulent conveyance claim, the Trust may recover only property

2    owned by the parent-company debtor.  The various schedules and

3    Chapter 11 plan, which were consummated with the agreement of

4    appellant and its predecessors in interest in the bankruptcy

5    proceeding, all treated the property transferred as owned by a

6    separate subsidiary.  We, therefore, affirm on grounds of

7    judicial estoppel.

8                              BACKGROUND

9        Adelphia Communications Corp. ("ACC") was the parent company

10   of some 200 holding and operating subsidiaries (collectively,

11   "Adelphia").  At its peak, Adelphia formed the fifth-largest

12   cable company in the United States.  ACC, at all relevant times a

13   publicly traded company, was founded by John Rigas in 1986, and

14   members of the Rigas family held several top positions at ACC.

15   After ACC disclosed that it had several billion dollars in

16   fraudulently concealed, off-balance-sheet debt, Rigas family

17   members were forced to resign from their positions and faced

18   various civil and criminal actions.  <u>See, e.g.</u>, <u>United States v.</u>

19   <u>Rigas</u>, 490 F.3d 208 (2d Cir. 2007).

20       On June 25, 2002, ACC and its subsidiaries entered

21   bankruptcy under Chapter 11.  Pursuant to an ensuing plan of

22   reorganization, substantially all assets of ACC and its

23   subsidiaries were liquidated, and all secured creditors of ACC

24   and its subsidiaries were paid in full.  In addition, all

25   unsecured debt of the subsidiaries was also paid in full with

26   interest, and a portion of ACC's unsecured debt was paid.  Those

1  creditors of ACC who were not paid in full received an interest

2  in any remaining assets that appellant can recover.

3      In July 2003, appellant's predecessor in interest filed suit

4  against over 400 lenders, investment banks, and other financial

5  institutions, seeking damages for their alleged participation in

6  the Rigas family fraud.  This action included the present action

7  against Goldman, Sachs & Co. ("Goldman").[1]

8      Appellant's action against Goldman alleges a fraudulent

9  conveyance under 11 U.S.C. §§ 548(a)(1)(A) and 550(a).  It arose

10  out of a 1999 multi-million margin loan that Goldman had extended

11  to Highland Holdings II LLP ("Highland"), an entity owned by the

12  Rigas family (a Rigas family entity, or "RFE") unconnected to

13  Adelphia.  The loan, which was secured by ACC stock owned by

14  Highland, was allegedly used by the Rigases to purchase

15  additional ACC stock and thereby to maintain their control over

16  Adelphia.  As ACC's stock price decreased following the

17  disclosure of the fraudulent concealment of debt in 2002, Goldman

18  issued several margin calls to Highland.  The complaint alleged

19  that the Rigases caused ACC to make cash payments of $63 million

20  to cover these margin calls.

---

[1] On June 17, 2008, the claims asserted on behalf of ACC subsidiary debtors, who had already been paid in full, were dismissed for lack of standing.  Adelphia Recovery Trust v. Bank of Am., N.A., 390 B.R. 80, 97 (S.D.N.Y. 2008).  The remaining claims were ultimately settled or dismissed against all defendants other than Goldman, Sachs & Co.  Although Goldman had also moved for dismissal of the claim against it, the district court allowed the claim to continue to summary judgment to determine whether the source of the payments to Goldman was ACC or a subsidiary.

1    Appellant's allegations against Goldman were amended several

2    times at the suggestion of the district court.  The court was

3    concerned that "[t]he Amended Complaint does not identify which

4    fraudulent conveyances came from ACC and which came from the

5    [subsidiaries].  This omission is significant because [appellant]

6    lacks standing to pursue claims to recover for fraudulent

7    conveyance on behalf of the [subsidiaries]." Adelphia Recovery

8    Trust v. Bank of Am., N.A., No. 05-civ-9050, 2009 WL 1676077, at

9    *2 (S.D.N.Y. June 16, 2009).  The district court, therefore,

10   directed appellant to "submit a revised version of paragraph 1359

11   of the Amended Complaint.  The revised paragraph should identify

12   which payments to [Goldman] came from ACC." Id.

13       Pursuant to this order, appellant submitted a revised

14   version of the complaint that alleged, in relevant part:

15                    [T]he Rigases caused ACC to commingle funds
16                    in the concentration account that it
17                    controlled, in the name of [a subsidiary]
18                    Adelphia Cablevision LLC, from such sources
19                    as customer receipts, liquidation of
20                    overnight investment accounts, and transfers
21                    from various subsidiary entities . . . in
22                    order to satisfy these margin calls.  On each
23                    date identified in the following charts, the
24                    Rigases caused ACC to direct that the funds
25                    it had gathered in the concentration account
26                    be distributed by Adelphia Cablevision LLC
27                    directly to the Margin Lenders or to the RFE
28                    for immediate payment over to the Margin
29                    Lenders.
30
31   Rev. Second Am. Compl. ¶ 1359.

32       It appears from this allegation and the record that the

33   pertinent payments were made either:  (i) directly to Goldman

6

1 from a particular account (the "Concentration Account"), which

2 contained most of the funds in the cash management system through

3 which the collective cash of ACC and its subsidiaries was

4 managed; or (ii) indirectly from the Concentration Account

5 through an RFE and then to Goldman.  Appellant seeks in this

6 action to recover $63 million.

7       In the district court, and here, appellant faced the problem

8 that the payments to Goldman were made in the name of the

9 subsidiary, Adelphia Cablevision LLC, that held the Concentration

10 Account and that has paid all its scheduled creditors, which did

11 not include ACC, in full.  Accordingly, appellant lacked standing

12 to sue the subsidiary.  It therefore argued, based on the amended

13 allegation quoted above, that ACC was the real owner of, and

14 payor from, the Concentration Account.  <u>Adelphia Recovery Trust</u>

15 <u>v. Bank of Am., N.A.</u>, No. 05-cv-9050, 2011 WL 1419617 at *2

16 (S.D.N.Y. Apr. 7, 2011).  The district court disagreed and

17 granted Goldman's motion for summary judgment.  <u>Id.</u>  The court

18 stated, "it is admitted by [appellant's] own revised pleading

19 that the margin loan payments were not made by ACC but by

20 Adelphia Cablevision LLC, an ACC subsidiary on whose behalf

21 [appellant] does not have standing to sue."  <u>Id.</u>

22       This appeal followed.

                              DISCUSSION

24       We review <u>de novo</u> whether Goldman was entitled to summary

25 judgment as a matter of law.  <u>See, e.g.</u>, <u>Miller v. Wolpoff &</u>

7

1  <u>Abramson, L.L.P.</u>, 321 F.3d 292, 300 (2d Cir. 2003); <u>Mario v. P&C</u>

2  <u>Food Mkts., Inc.</u>, 313 F.3d 758, 763 (2d Cir. 2002).

3        The sole issue is whether the amended complaint states a

4  valid claim of a fraudulent conveyance under 11 U.S.C.

5  §§ 548(a)(1)(A) and 550(a).  Section 548(a)(1)(A) provides, in

6  relevant part:

7          The trustee may avoid any transfer . . . of
8          an interest of the debtor in property . . .
9          that was made or incurred on or within 2
10         years before the date of the filing of the
11         [bankruptcy] petition, if the debtor
12         voluntarily or involuntarily . . . made such
13         transfer . . . with actual intent to hinder,
14         delay, or defraud any entity to which the
15         debtor was or became, on or after the date
16         that such transfer was made[,] . . .
17         indebted.
18
19 11 U.S.C. § 548(a)(1)(A).  The avoidance power thus applies only

20 to "transfers of property of the debtor," <u>Begier v. IRS</u>, 496 U.S.

21 53, 58 (1990), which includes "all legal or equitable interests

22 of the debtor in property as of the commencement of the case," 11

23 U.S.C. § 541(a)(1).  Whether the margin loan payments to Goldman

24 were transfers of the property of ACC, or should be deemed to be

25 so, is the issue on appeal.

26       Appellant argues that we should follow decisions of the

27 Fifth and Tenth Circuits, <u>Matter of Southmark Corp.</u>, 49 F.3d 1111

28 (5th Cir. 1995) and <u>In re Amdura Corp.</u>, 75 F.3d 1447 (10th Cir.

29 1996), to determine whether ACC was the true owner of the

30 commingled Concentration Account.  Together, these cases are said

31 to support a principle of attributing ownership of funds

32 aggregated in a communal account to a parent when the parent

1    exercises complete dominion over the funds, and has all legally
2    cognizable indicia of ownership.  In Southmark, the court
3    determined that because Southmark owned and controlled the cash
4    management account, the subsidiary's settlement payment from that
5    account to its former president and director could be avoided by
6    Southmark because the funds were part of, and under complete
7    control by, Southmark's estate.  49 F.3d at 1117.  And in Amdura,
8    the court held that funds in a commingled cash management account
9    belonged to the parent Amdura, even though subsidiaries had
10   contributed to the account, because Amdura was listed as the
11   owner and "possessed all other legally cognizable indicia of
12   ownership."  75 F.3d at 1451.

13       However, neither decision was rendered in a legal context
14   similar to the one before us or involved application of the
15   judicial estoppel doctrine.  Throughout the reorganization
16   proceedings here, the Concentration Account was listed as an
17   asset only of two successive ACC subsidiaries, not the property
18   of ACC.  The theory that the Concentration Account was actually
19   the property of ACC appeared for the first time late in the
20   present litigation, as described above, and well after
21   consummation of the plan of reorganization.

22       Appellant's (or its predecessors' in interest) position in
23   the bankruptcy proceedings regarding ownership of the account is

9

1   inconsistent with the claim it makes on appeal.[2]  Given the

2   importance to bankruptcy proceedings of determining with finality

3   a debtor's ownership of particular assets, we hold that

4   appellants are estopped from pursuing a claim that would

5   reattribute asset ownership based on a determination of asset

6   ownership among the various entities agreed to by the pertinent

7   parties, after a plan of reorganization has been confirmed and

8   substantially consummated.

9   a) <u>Principles of Judicial Estoppel</u>

10       In <u>New Hampshire v. Maine</u>, the Supreme Court made clear that

11  the exact criteria for invoking judicial estoppel will vary based

12  on "specific factual contexts," and that "courts have uniformly

13  recognized that its purpose is to protect the integrity of the

14  judicial process by prohibiting parties from deliberately

15  changing positions according to the exigencies of the moment."

16  532 U.S. 742, 749-51 (2001) (internal citations and quotation

17  marks omitted).  <u>New Hampshire</u> explains that,

18           Courts have observed that the circumstances
19           under which judicial estoppel may
20           appropriately be invoked are probably not

---

        [2] Attribution of the Concentration Account to ACC required an explicit
claim of ownership by ACC in the bankruptcy proceeding.  First, bank
statements listed the account holder's Taxpayer ID Number as that
corresponding to the ACC subsidiary National Cable Acquisition Associates.
Second, within Adelphia the Concentration Account was referred to as the
Adelphia Cablevision (an ACC subsidiary) account, and Adelphia Cablevision was
the entity that made and received payments involved with the Account.
Finally, any of ACC, its subsidiaries, or RFEs could direct that money be paid
from the Account on their behalf by wire or check regardless of how much they
had contributed to the account, and if at any time the payments on behalf of
these entities exceeded the entity's contribution to the Account, an
intercompany payable to Adelphia Cablevision by those entities was created.

> reducible to any general formulation of
> principle. Nevertheless, several factors
> typically inform the decision whether to
> apply the doctrine in a particular case:
> First, a party's later position must be
> clearly inconsistent with its earlier
> position. Second, courts regularly inquire
> whether the party has succeeded in persuading
> a court to accept that party's earlier
> position, so that judicial acceptance of an
> inconsistent position in a later proceeding
> would create the perception that either the
> first or the second court was misled. . . . A
> third consideration is whether the party
> seeking to assert an inconsistent position
> would derive an unfair advantage or impose an
> unfair detriment on the opposing party if not
> estopped. In enumerating these factors, we do
> not establish inflexible prerequisites or an
> exhaustive formula for determining the
> applicability of judicial estoppel.

Id. at 750-51. (internal citations and quotation marks omitted).

Although we have recognized that "[t]ypically" the application of judicial estoppel requires showing unfair advantage against the party seeking estoppel, DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010) (requiring a party to show a clearly inconsistent position, adoption of that position by a court in an earlier proceeding, and unfair advantage against the party seeking estoppel in the ADA context), we have not required this element in all circumstances. See Maharaj v. BankAmerica Corp., 128 F.3d 94, 98 (2d Cir. 1997) (not requiring the element of unfair advantage); Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999) (same).  This is consistent with New Hampshire's admonishment that the application of the judicial estoppel doctrine depends heavily on the "specific factual context[]" before the court. 531 U.S. at 751.  We do note,

11

1   though, that every case emphasizes that "[b]ecause the doctrine

2   is primarily concerned with protecting the judicial process,

3   relief is granted only when the risk of inconsistent results with

4   its impact on judicial integrity is certain." <u>Republic of Ecuador</u>

5   <u>v. Chevron Corp.</u>, 638 F.3d 384, 397 (2d Cir. 2011) (internal

6   quotation marks omitted).

7          Our holding in this regard is shaped by the context of a

8   complicated bankruptcy proceeding involving 250 related,

9   insolvent entities, and the risk to judicial integrity if we were

10  to allow a party, after the consummation of a bankruptcy, to take

11  a position that unravels key decisions in the proceedings.  We

12  first turn to a description of the legal mechanics of such a

13  proceeding.

14  b) <u>The Bankruptcy Context</u>

15         Following a filing for Chapter 11 bankruptcy reorganization,

16  the debtor must file "a list of creditors[,] a schedule of assets

17  and liabilities[,] a schedule of current income and current

18  expenditures[, and] a statement of the debtor's financial

19  affairs."  11 U.S.C. § 521(a)(1).  The debtor is given a 120-day

20  exclusive period in which to submit a plan of reorganization, 11

21  U.S.C. § 1121(b), and a disclosure statement containing "adequate

22  information" to allow interested parties to evaluate that plan.

23  11. U.S.C. § 1125(a)-(b).  This plan includes items like complete

24  asset schedules.  <u>See</u> <u>Sure-Snap Corp. v. State St. Bank & Trust</u>

25  <u>Co.</u>, 948 F.2d 869, 873 (2d Cir. 1991); <u>see also</u> <u>Chartschlaa v.</u>

26  <u>Nationwide Mut. Ins. Co.</u>, 538 F.3d 116, 122 (2d Cir. 2008) (The

12

1  bankruptcy estate includes "all legal or equitable interests of
2  the debtor in property as of the commencement of the case" and
3  "[i]t would be hard to imagine language that would be more
4  encompassing than this broad definition." (internal citations and
5  quotation marks omitted)).

6      The debtor is given 180 days, extendable up to 20 months by
7  the court, from filing for Chapter 11 relief in which to obtain
8  the approval of "each class of claims or interests that is
9  impaired under the plan." 11 U.S.C. § 1121(c)-(d).  If the debtor
10  fails to file a plan or the debtor's exclusive filing period
11  expires without acceptance of a proposed plan by the parties in
12  interest, any party in interest can file a competing plan and
13  seek approval by the parties in interest.  11 U.S.C. § 1121(c).
14  Both the debtor's plan and any competing plan must meet various
15  mandatory provisions and may meet various discretionary
16  provisions.  11 U.S.C. §§ 1122, 1123(a), (b).  Foremost among the
17  mandatory requirements is that the plan designate classes of
18  claims and classes of interests and specify how these classes
19  will be treated under the plan.  11 U.S.C. §§ 1122, 1123(a).

20      Once a conforming plan has been proposed, parties in
21  interest can vote to approve it.  Following approval by at least
22  one class of impaired non-insider claims -- claims that will not
23  be paid completely or will have some other right altered under
24  the plan -- the court can confirm the plan and bind all creditors
25  if the plan is feasible, was proposed in good faith, and is in
26  compliance with the Bankruptcy Code.  11 U.S.C. § 1129(a)(10),

1  (b); Fed. R. Bankr. P. 3020(b)(2).  Once the plan is confirmed,

2  the debtor is discharged from any prepetition debts, subject to

3  specific exceptions not relevant here, as long as the confirmed

4  bankruptcy plan is followed.  11 U.S.C. §§ 1141(d)(1), 523.

5  c) <u>Application of Judicial Estoppel</u>

6      As the recitation of bankruptcy procedures and time frames

7  makes clear, debtors and creditors have ample periods of time

8  within which to finalize asset ownership schedules and fashion a

9  plan dependent upon those schedules.

10      In the present case, ACC filed for bankruptcy on June 25,

11  2002; the ultimately-confirmed plan was proposed on October 16,

12  2006; and the plan was confirmed on January 5, 2007, leaving over

13  four and a half years to sort out whether ACC or a subsidiary

14  owned the Concentration Account assets.  At no time during these

15  proceedings did ACC or any party attribute ownership of the

16  Concentration Account assets to ACC.  At the time of bankruptcy

17  filing and again in February 2004, the ACC subsidiary ACC

18  Operations, Inc. identified the Concentration Account as its

19  property; ACC did not.  Amendments to the schedules of

20  liabilities in January and May 2005 listed the ACC subsidiary

21  Adelphia Cablevision as the owner of the Account in concluding

22  that "intercompany transfers between a Debtor on the one hand,

23  and Adelphia Cablevision [as owner of the Concentration Account]

24  on the other hand, have been netted in the Intercompany Schedule,

25  creating either a net payable or receivable intercompany balance

26  between each such Debtor and Adelphia Cablevision."  ACC never

14

1    claimed the Account as one of its assets until such a claim of
2    ownership was asserted in the present proceeding in 2009.  Nor
3    did any other party assert such a claim or seek a substantive
4    consolidation of ACC and Adelphia Cablevision's bankruptcies, as
5    permitted in bankruptcy proceedings to remedy circumstances where
6    formally separate entities commingle and subject their collective
7    assets to single control.  See In re Augie/Restivo Baking Co.,
8    860 F.2d 515, 518-19 (2d Cir. 1988).

9        Further, the bankruptcy plan undeniably was substantially
10   consummated as early as 2007.  In re Adelphia Comm'cns Corp., 367
11   B.R. 84, 94 (S.D.N.Y. 2007).  Substantial consummation, as
12   defined in 11 U.S.C. § 1101(2), requires the "transfer of all or
13   substantially all of the property" in the plan, "assumption by
14   the debtor . . . of all or substantially all of the property
15   dealt with by the plan," and "commencement of distribution under
16   the plan."  Over $6 billion in cash, $117 million in tradeable
17   Time Warner shares, and $9.5 billion in tradeable Adelphia
18   Contingent Value Vehicle shares (shares set up as an interest in
19   Adelphia recoveries against third party lenders and accountants)
20   were distributed to claimholders as of early March 2007, just
21   after confirmation of the plan.  Since then, substantially all
22   Adelphia's assets have been liquidated, returning approximately
23   $18 billion to claimholders.

24       In the bankruptcy context, whether a party's position with
25   regard to the ownership of assets is inconsistent with its later
26   claims is largely informed by the bankruptcy court's treatment of

15

1  those claims.  See Galin v. United States, No. 08-cv-2508, 2008

2  WL 5378387, at *10 (E.D.N.Y. Dec. 23, 2008) ("adoption" in

3  judicial estoppel "is usually fulfilled . . . when the bankruptcy

4  court confirms a plan pursuant to which creditors release their

5  claims against the debtor" (quoting Negron v. Weiss, No. 06-cv-

6  1288, 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006))).

7  Determination of the ownership of assets is at the core of the

8  bankruptcy process, and particularly the creation of a bankruptcy

9  reorganization plan, which involves "a schedule of all [the

10  debtors'] liquid assets and liabilities," and thereafter

11  operates, with full preclusive effect, to "bind its debtors and

12  creditors as to all the plan's provisions, and all related,

13  property or non-property based claims which could have been

14  litigated in the same cause of action."  Sure-Snap Corp., 948

15  F.2d at 873 (citing 11 U.S.C. §§ 521(a)(1), 1141(a)).

16      It is therefore crucial, both for the sake of finality and

17  the needs of debtors and creditors, that claims to ownership of

18  various assets be determined in the bankruptcy proceedings.

19  Particularly when, as here, the assets in question were claimed

20  by other parties during the bankruptcy proceeding without

21  objection, a debtor's subsequent claim to those assets in a

22  different proceeding must be seen as inconsistent with its prior

23  silence.[3]  Cf. Chartschlaa, 538 F.3d at 123 ("The Bankruptcy Code

---

[3] A party may be bound by the position taken by its predecessors in
interest in prior proceedings.  See, e.g., Secured Equities Invs., Inc. v.
McFarland, 753 N.Y.S.2d 264, 264 (4th Dep't 2002)).

1  is premised on full and complete disclosure of the debtor's

2  finances."). Any other holding would encourage sharp practices,

3  involving strategic denials or affirmations of asset ownership

4  timed to the legal exigencies of the moment, precisely what the

5  doctrine is intended to prevent.

6      The bankruptcy court's treatment of the asset schedules in

7  the present matter underlies their importance and the need for

8  finality. In order for the reorganization to proceed, the

9  Adelphia entities underwent a massive restatement of their

10 accounting records, which sought to provide separate, audited

11 financials for each insolvent entity. In re Adelphia, 368 B.R. at

12 150-51. The allocation of assets to the various entities was of

13 central importance to this process. One of the foremost

14 difficulties the bankruptcy court encountered was the issue of

15 intercompany transfers between the various entities controlled by

16 the Rigas family. See id. at 152. The resolution of this problem

17 depended on the parties' adoption of the so-called "Bank of

18 Adelphia Paradigm,"[4] which tracked intercompany transfers through

19 a single RFE subsidiary that controlled the main account:

20 Adelphia Cablevision. Id. at 151-53. Adelphia Cablevision was

21 listed as the owner of the Concentration Account in both the

---

[4] "[I]ntercompany transactions (e.g., cash receipts, disbursements, acquisition accounting and cost allocations) were deemed to have been made by or to a single entity, Adelphia Cablevision, LLC (the 'Bank of Adelphia'). This methodology, often referred to as the 'Bank of Adelphia Paradigm,' aggregated intercompany transaction balances consistent with the actual flow of funds within the Debtor's cash management system." In re Adelphia, 368 B.R. at 151.

January and May amendments to the debtors' schedules of assets
and liabilities, and neither ACC nor appellant's predecessors in
interest contested that determination.

The asset schedules thus played a key role in both the
bankruptcy court's supervision of the process and in the parties'
understanding of the plan.  As the district court noted in its
discussion of substantive consolidation, such relief was "highly
unlikely" because "the Debtors have issued restated financial
statements and filed the May 2005 Schedules, thus evidencing an
ability to generally determine the assets and liabilities of each
Debtor." Id. at 219 (discussing In re Augie/Restivo, 860 F.2d at
519) (internal quotation marks omitted).  The Bank of Adelphia
paradigm, which included Adelphia Cablevision's ownership of the
account in the asset schedules, was the cornerstone of the
bankruptcy plan, and without it the entire process would have
been at risk of unraveling.  We, therefore, decline to issue a
ruling inconsistent with the factual underpinnings of this duly
confirmed and substantially consummated bankruptcy plan.

A different ruling would threaten the integrity of the
bankruptcy process by encouraging parties to alter their
positions as to ownership of assets as they deem their litigation
needs to change, leaving courts to unravel previously closed
proceedings.  Doing so would allow parties an opportunity to
"play[] fast and loose" with the requirements of the bankruptcy
process and inject an unacceptable level of uncertainty into its
results -- exactly the result that the doctrine of judicial

18

1  estoppel is intended to avoid.  <u>Wight v. BankAmerica Corp.</u>, 219

2  F.3d 79, 89 (2d Cir. 2000); <u>accord</u> <u>In re Adelphia Recovery Trust</u>,

3  634 F.3d at 696 (integrity of judicial process threatened by

4  parties taking a short term position that risks being

5  inconsistent with its future position, not only by "knowingly

6  [lying]").

7       In relying upon the prospective harm to the integrity of

8  bankruptcy proceedings that would result from a different ruling,

9  we do not exclude the possibility of specific harm, or unfair

10  disadvantage to, Goldman beyond the possible loss of $63 million.

11  We simply decline to require Goldman and the courts having to

12  unravel all previous proceedings to determine what would have

13  happened had appellant or its predecessors in interest claimed

14  ownership of the Concentration Account in a timely fashion.

15       We also do not exclude the possibility that, in an unusual

16  case, the allocation of specific assets may be largely irrelevant

17  to the bankruptcy court's actions.  However, given the centrality

18  of asset allocation to the integrity of the bankruptcy process,

19  <u>see</u> <u>Chartschlaa</u>, 538 F.3d at 122, particularly where multiple

20  related entities are involved, a creditor who fails to lay claim

21  to an asset in the bankruptcy court only to do so in subsequent

22  litigation must, to prevail, bear the heavy burden of showing a

23  <u>de minimis</u> effect on the bankruptcy proceeding.

24                          CONCLUSION

25       The requirements of judicial estoppel are, therefore, met.

26  The asset schedules showing that the Concentration Account was

1   held by a subsidiary of ACC were approved by appellant's

2   predecessors in interest.  The bankruptcy court adopted the asset

3   schedules and approved a plan of reorganization that treated ACC

4   separately from its subsidiaries based on those schedules.

5   Revisiting the accuracy of those schedules to permit the present

6   action to proceed would clearly threaten the integrity of

7   bankruptcy proceedings.  We, therefore, hold that appellant's

8   complaint is barred by the doctrine of judicial estoppel.  The

9   judgment of the district court is affirmed.

10

11